

**FILED**

SEP 3 0 2015

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| GSAA HOME EQUITY TRUST 2006-2, BY AND THROUGH LL FUNDS LLC, | 4:14-CV-04166-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS |
| WELLS FARGO BANK, N.A., and SAXON MORTGAGE SERVICES, INC., | |
| Defendants. | |

Plaintiff GSAA Home Equity Trust 2006-2 (the Trust) is a residential mortgage-backed securities trust. Defendant Wells Fargo, N.A. (Wells Fargo) is the Master Servicer of the Trust and Defendant Saxon Mortgage Services, Inc. (Saxon) was the Trust's Servicer. The Trust, by and through Plaintiff LL Funds LLC (LL Funds), filed suit in this Court, asserting breach of contract and tort claims against both Defendants and a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, against Wells Fargo. Doc. 1. Defendants have moved to dismiss all of LL Funds' claims under Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure. Docs. 25, 28. For the reasons explained below, this Court grants in part and denies in part Defendants' motions to dismiss.

**I.     Facts**

This case involves residential mortgage-backed securities (RMBS). RMBS are a type of asset-backed financial product created through securitization. The securitization process begins

1

when the originator of a residential mortgage loan sells the loan to a financial institution. Doc. 1 at ¶ 12. The financial institution then pools the loan with others, deposits the loans into a trust, and sells certificates issued by the trust to investors. Doc. 1 at ¶¶ 12, 17. The certificates entitle the investors to a portion of the mortgage payments made by the borrowers on the loans within the trust. Doc. 1 at ¶¶ 15–16.

The Trust in this case was established in January 2006 pursuant to a Master Servicing and Trust Agreement (MSTA). Doc. 1 at ¶¶ 1–2. The parties to the MSTA were GS Mortgage Securities Corporation as Depositor; Deutsche Bank National Trust Company (Deutsche) as Trustee and Custodian; and Wells Fargo as Master Servicer. Doc. 1 at ¶ 2. The MSTA provides that it is governed by New York law. Doc. 27-2 at 51. Saxon agreed to be the Servicer for the loans in the Trust by entering into a Flow Servicing Rights Purchase and Servicing Agreement (Servicing Agreement) with Goldman Sachs Mortgage Company. Doc. 1 at ¶ 5; Doc. 27-1 at 46. The Servicing Agreement was eventually assigned to Deutsche.

Saxon's responsibilities under the Servicing Agreement included collecting mortgage loan payments from borrowers, Doc. 30-1 at 26, remitting the collected payments to the Trust, Doc. 30-1 at 26–28, engaging in loss mitigation efforts with delinquent borrowers, Doc. 30-1 at 22–23, and, if necessary, pursuing foreclosure proceedings on the Trust's behalf, Doc. 30-1 at 24–25. Under the Servicing Agreement, Saxon had a duty to ensure that its mortgage servicing practices were in conformity with those of prudent mortgage lending institutions which service similar mortgage loans. Doc. 1 at ¶ 20; Doc. 30-1 at 7, 22, 24. As the Master Servicer, Wells Fargo had a duty under the MSTA to "monitor the performance of the Servicer under the related Servicing Agreements" and to "use its reasonable good faith efforts to cause the Servicer to duly and punctually perform their duties and obligations thereunder." Doc. 27-2 at 30; Doc. 1 at ¶ 21.

2

Section 12.07 of the MSTA contains what is commonly referred to as a "no-action

clause" which provides in relevant part:

> No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as herein provided, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding . . . .

Doc. 27-2 at 53.

LL Funds owns and holds certificates issued under the MSTA evidencing 25% or greater

of the voting rights of the Trust. Doc. 1 at ¶¶ 3, 10. The Complaint does not aver that LL Funds

owned 25% or greater of the voting rights during the time Saxon was the Servicer. In March

2014, after Saxon no longer was servicing loans in the Trust, LL Funds sent a letter to Deutsche

directing it to sue Saxon and "any other parties under the MSTA . . . while Saxon was a

Servicer" for, among other things, breach of contract and negligence. Doc. 1 at ¶ 3; Doc. 1-1 at

1. LL Funds explained in the letter that it was making a written request under § 12.07 of the

MSTA for Deutsche to institute an action in its own name as Trustee. Doc. 1 at ¶ 3; Doc. 1-1 at

1–2. LL Funds further explained that it had not given a separate notice of an Event of Default

under § 12.07 because Saxon was no longer the Servicer for the Trust and could not remedy the

conduct in question. Doc. 1 at ¶ 3; Doc. 1-1 at 2. To the extent that a separate notice of an Event

3

of Default was necessary, however, LL Funds asked Deutsche to consider the letter as providing such notice. Doc. 1-1 at 2.

After Deutsche allowed more than sixty days to pass without bringing suit, LL Funds filed the present Complaint against Saxon and Wells Fargo. Doc. 1 at ¶ 3. Rather than focusing on Wells Fargo's actions as the Master Servicer of the Trust, the Complaint consists in large part of allegations concerning Wells Fargo's conduct as the servicer for loans in other trusts or other settings. Doc. 1 at ¶¶ 30–34, 40–45. According to the Complaint, Wells Fargo entered into consent orders with various federal agencies after investigations by these agencies revealed that Wells Fargo had engaged in "robo-signing"[1] and other improper conduct in its capacity as a servicer of loans not in this particular Trust. Doc. 1 at ¶¶ 30–34, 40–45.

The Complaint contains similar allegations about Saxon. LL Funds alleged in the Complaint that Saxon entered into a Consent Order (Saxon Consent Order) with the Board of Governors of the Federal Reserve in April 2012. Doc. 1 at ¶ 35. The Consent Order alleged that when foreclosing on certain residential mortgage loans that it serviced, Saxon had filed or caused to be filed affidavits purportedly based on the affiant's personal knowledge when in fact they were not; litigated foreclosure proceedings without ensuring that the mortgage and related documents were in order; failed to allocate proper resources to handle the increased level of foreclosures and loss mitigation activities; and failed to exercise adequate control over the foreclosure process. Doc. 1 at ¶ 35; Doc. 30-3 at 1–4. LL Funds alleged in the Complaint that "[o]n information and belief, . . . Saxon filed in county recording or land offices and in courts

---

[1]LL Funds defines robo-signing as "the practice of signing mortgage assignments, satisfactions and other mortgage-related documents in assembly-line fashion, often with a name other than the affiant's own, and swearing to personal knowledge of facts of which the affiant has no knowledge." Doc. 1 at ¶ 29.

4

flawed, misleading, improper and arguably unlawful documents as set forth in the above-referenced [Saxon Consent Order] with regard to the Trust." Doc. 1 at ¶ 36.

Based on these allegations and others, LL Funds asserted claims for breach of contract against Wells Fargo (Count I); breach of contract against Saxon (Count II); negligence against Wells Fargo and Saxon (Count III); willful misfeasance/misconduct or gross negligence against Wells Fargo and Saxon (Count IV); and a violation of RICO against Wells Fargo (Count V). Doc. 1. Defendants offer multiple arguments in support of their motion to dismiss, each of which is discussed below.

## II.    Standards of Review

On a motion to dismiss under Rule 12(b)(6), courts must accept the plaintiff's factual allegations as true and construe all inferences in the plaintiff's favor, but need not accept a plaintiff's legal conclusions. Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). To survive a motion to dismiss for failure to state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are unnecessary, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. When determining whether to grant a Rule 12(b)(6) motion, a court generally must ignore materials outside the pleadings, but it may "consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, items appearing in the record of the case, and exhibits attached to the complaint.'" Dittmer Props, L.P. v. FDIC,

708 F.3d 1011, 1021 (8th Cir. 2013) (quoting Miller v. Redwood Toxicology Lab., Inc., 688 F.3d

928, 931 n.3 (8th Cir. 2012)); see also Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th

Cir. 2003) (explaining that courts may also consider "documents whose contents are alleged in a

complaint and whose authenticity no party questions, but which are not physically attached to the

pleading" (quoting Rosenbaum v. Syntex Corp. (In re Syntex Corp. Sec. Litig.), 95 F.3d 922,

926 (9th Cir. 1996))). In addition to the allegations in the Complaint, this Court has considered

the Saxon Consent Order (but not for the truth of the allegations therein), the Servicing

Agreement, the MSTA, and LL Funds' letter to Deutsche.

Rule 12(b)(1) provides for dismissal of a suit when the court lacks subject matter

jurisdiction. The United States Court of Appeals for the Eighth Circuit has drawn a distinction

between facial and factual 12(b)(1) motions, explaining the applicable standard in each instance.

See Osborn v. United States, 918 F.2d 724, 728–30 (8th Cir. 1990). Under a facial attack, "the

court restricts itself to the face of the pleadings, and the non-moving party receives the same

protections as it would defending against a motion brought under Rule 12(b)(6)." Jones v.

United States, 727 F.3d 844, 846 (8th Cir. 2013) (quoting Osborne, 918 F.2d at 729 n.6). Under

a factual attack, however,

> the trial court may proceed as it never could under 12(b)(6) or Fed.
> R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the
> trial court's jurisdiction—its very power to hear the case—there is
> substantial authority that the trial court is free to weigh the
> evidence and satisfy itself as to the existence of its power to hear
> the case. In short, no presumptive truthfulness attaches to the
> plaintiff's allegations, and the existence of disputed material facts
> will not preclude the trial court from evaluating for itself the merits
> of jurisdictional claims.

Osborne, 918 F.2d at 730 (quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884,

891 (3d Cir. 1977)). Plaintiffs faced with either a factual or facial attack under Rule 12(b)(1)

6

have the burden of proving subject matter jurisdiction. V S Ltd. P'ship v. Dep't of Hous. & Urban Dev., 235 F.3d 1109, 1112 (8th Cir. 2000).

## III. Analysis

### A. Standing

Saxon contends that LL Funds' claims are derivative and therefore must be dismissed for lack of standing because LL Funds failed to comply with the contemporaneous ownership rule embodied in Federal Rule of Civil Procedure 23.1(b)(1) and New York Business Corporation Law § 626. Alternatively, Saxon argues that even if LL Funds' claims are direct rather than derivative, LL Funds still lacks standing because LL Funds purchased its certificates on the secondary market and further did not have a contractual relationship with Saxon.

Federal Rule of Civil Procedure 23.1 "applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). One of the pleading requirements of Rule 23.1 is that the plaintiff must allege in a verified complaint that it "was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). "Similarly, New York Business Corporation Law § 626(b) requires that a plaintiff in a shareholder derivative suit have been 'a [share]holder at the time of the transaction of which he complains' in order to have standing." Kaliski v. Bacot (In re Bank of N.Y. Derivative Litig.), 320 F.3d 291, 297 (2d Cir. 2003) (alteration in original) (quoting N.Y. Bus. Corp. § 626(b)). "The main purpose of this so-called contemporaneous ownership rule is to prevent courts from being used to litigate purchased grievances." Id. (alterations, citation, and internal quotation marks omitted).

7

Although neither Rule 23.1 nor New York Business Corporation Law § 626 specifically mention suits by beneficiaries of a trust, federal district courts have applied these rules to derivative suits by certificateholders in mortgage-backed securities trusts. See Fed. Hous. Fin. Agency v. WMC Mortg., LLC, No. 13 Civ. 584(AKH), 2013 WL 5996530, at *1 (S.D.N.Y. June 12, 2013); SC Note Acquisitions, LLC v. Wells Fargo Bank, 934 F. Supp. 2d 516, 528–29 (E.D.N.Y. 2013), aff'd, 548 F. App'x 741 (2d Cir. 2014). The question here, then, is whether LL Funds' claims are direct or derivative.

When analyzing whether a claim is derivative, courts "must look to the nature of the alleged wrong rather than the designation used by plaintiffs." Ellington Credit Fund v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 188 (S.D.N.Y. 2011) (quoting Primavera Familienstiftung v. Askin, No. 95 Civ. 8905 (RWS), 1996 WL 494904, at *14–15 (S.D.N.Y. Aug. 30, 1996)). In the past, some federal district courts in New York followed the rule that "an alleged injury that is 'equally applicable' to all shareholders gives rise to a derivative, not a direct, action." Dall. Cowboys Football Club, Ltd. v. Nat'l Football League Tr., No. 95 CIV. 9426 (SAS), 1996 WL 601705, at *2 (S.D.N.Y. Oct. 18, 1996) (quotation omitted); SC Note, 934 F. Supp. 2d at 530 (quoting and applying rule announced in Dallas Cowboys). Just this year, however, the author of Dallas Cowboys abandoned the rule stated in that decision in favor of the test articulated by the Supreme Court of Delaware in Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004). See Royal Park Invs. SA/NV v. HSBC Bank USA, Nos. 14-cv-8175 (SAS), 14-cv-9366 (SAS), 14-cv-10101 (SAS), 2015 WL 3466121, at *15–16 (S.D.N.Y. June 1, 2015) (noting that a New York appellate court had adopted the Tooley test and concluding that the test was consistent with New York law); see also Hansen v. Wwebnet, Inc., No. 1:14-cv-2263 (ALC), 2015 WL 4605670, at *4 (S.D.N.Y. July 31, 2015) (applying Tooley

8

to determine whether claim was derivative under New York law). A New York appellate court has adopted Tooley, so the test in Tooley should control whether an action is direct or derivative under New York law. See Serino v. Lipper, 994 N.Y.S.2d 64, 69 (N.Y. App. Div. 2014) (acknowledging adoption of the Tooley test and explaining that the test is consistent with existing New York law); Yudell v. Gilbert, 949 N.Y.S.2d 380, 384 (N.Y. App. Div. 2012) (adopting Tooley).

In Tooley, the Supreme Court of Delaware explained that the test for determining whether a stockholder's claim is direct or derivative must be based "*solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley, 845 A.2d at 1033. To be considered direct under the Tooley test, a stockholder's "injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation." Id. at 1039. The stockholder's injury need not be distinct from the injury suffered by other stockholders to be direct, however. The Supreme Court of Delaware in Tooley "expressly disapprove[d]" of "the concept that a claim is necessarily derivative if it affects all stockholders equally." Id.; see also Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank Nat'l Ass'n, No. 14-cv-9401 (KBF), 2015 WL 2359319, at *6 n.12 (S.D.N.Y. May 18, 2015) (concluding an allegation that all certificateholders would suffer harm equally was "immaterial" under Tooley).

Whether LL Funds' claims are direct or derivative under Tooley is a difficult question, which the parties have not analyzed. Compounding the difficulty of that question, the Supreme

9

Court of Delaware in NAF Holdings, LLC v. Li & Fung (Trading) Ltd., 118 A.3d 175 (Del. 2015), recently deemed Tooley to have "no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights." NAF Holdings, 118 A.3d at 176. The facts of NAF Holdings are distinguishable, and none of the parties briefed whether LL Funds is suing "directly to enforce those rights" LL Funds (as opposed to the Trust) has under a commercial contract. Instead of addressing Tooley, LL Funds argued in its brief that its claims are direct because it "seeks to recover its own unique losses within the waterfall," because the Complaint states that the claims are direct, and because it is suing on behalf of the Trust and in the name of the Trustee. These arguments are not satisfactory; whether LL Funds' injuries are unique from other Certificateholders is irrelevant under Tooley, the labels LL Funds applies to its claims are not determinative, and LL Funds has not provided any legal authority in support of its contention that a certificateholder's action on behalf of a trust or in the name of the trustee is direct. This entire question may be academic if in fact LL Funds owned the requisite certificates at the time of the transactions complained of, and thus this Court will allow LL Funds twenty-one days to file an Amended Complaint to satisfy the contemporaneous ownership rule. Alternatively, LL Funds may file a supplemental brief with citation to legal authority explaining why and how this is a direct action. Saxon and Wells Fargo then will be given an opportunity to respond within twenty-one days, and LL Funds may file a reply brief within fourteen days thereafter.

If LL Funds establishes that it may bring a direct action, this leaves Saxon's alternative argument that LL Funds lacks standing. Saxon contends that LL Funds does not have standing to sue it directly because LL Funds "necessarily purchased its Certificates in the secondary market" and any causes of action against Saxon did not transfer from the prior Certificateholder

to LL Funds. See Ellington, 837 F. Supp. 2d at 180–83 (holding that plaintiff did not have standing to assert claims against servicer that accrued prior to plaintiff's purchase of certificates because New York General Obligation Law § 13-107 did not provide for the transfer of such claims). The viability of this argument depends on when Saxon's alleged breach of contract occurred and when LL Funds purchased its Certificates. LL Funds failed to plead when it became a Certificateholder and should plead at a minimum that it owned Certificates when Saxon was the Servicer. LL Funds can address this standing issue through amendment of its Complaint or in the supplemental briefing ordered by this Court.

### B. No-Action Clause

Defendants make several arguments concerning why the no-action clause bars LL Funds' claims. First, Wells Fargo contends that because the no-action clause refers to an "Event of Default" rather than a "Master Servicer Event of Default," the clause bars all of LL Funds' claims against Wells Fargo, the Master Servicer. Second, Wells Fargo argues that even if the no-action clause applies to its conduct, LL Funds' notice letter to the Trustee was deficient with respect to Wells Fargo because the letter only expressly addressed claims against Saxon. Third, both Defendants assert that the no-action clause bars all of LL Funds' claims because the Events of Default alleged in LL Funds' notice letter were not continuing. Finally, Saxon argues that the no-action clause bars LL Funds' claims against it because LL Funds failed to give notice of an "Event of Default" as that term is defined in § 11.01(d) of the Servicing Agreement. In response, LL Funds contends that it was not required to comply with the no-action clause, that it has satisfied the requirements of the clause anyway, and that the clause does not apply to its tort and RICO claims.

11

No-action clauses limiting the rights of individual securityholders to sue are "standard provision[s]" in many trust agreements.    Akanthos Capital Mgmt., LLC v. CompuCredit Holdings Corp., 677 F.3d 1286, 1298 (11th Cir. 2012).  The main purpose of a no-action clause is "to avoid duplicative suits and protect the majority interests [of securityholders] by mandating that actions be channeled through the Trustee."   Quadrant Structured Prods. Co. v. Vertin, 16 N.E.3d 1165, 1177 (N.Y. 2014).   Courts have enforced no-action clauses "in a variety of contexts," McMahan & Co. v. Wherehouse Entm't, Inc., 65 F.3d 1044, 1050–51 (2d Cir. 1996), including on motions to dismiss under Rule 12(b)(6), SC Note, 934 F. Supp. 2d at 531–33 (dismissing claim under Rule 12(b)(6) for failure to comply with no-action clause); Sterling Fed. Bank v. DLJ Mortg. Capital, Inc., No. 09 C 6904, 2010 WL 3324705, at *4–5 (N.D. Ill. Aug. 20, 2010) (same).

Although no-action clauses need not be followed when enforcing them would require the "absur[ity]" of asking "the Trustee to sue itself," Cruden v. Bank of N.Y., 957 F.2d 961, 968 (2d Cir. 1992) (applying New York law), courts have enforced such clauses when doing so would require the trustee to sue a manager of the trust, Peak Partners v. Republic Bank, 191 F. App'x 118, 126–27 (3d Cir. 2006); SC Note, 934 F. Supp. 2d at 532; Ellington, 837 F. Supp. 2d at 186–87.  Under New York law, which the MSTA specifies to govern, no-action clauses "are to be construed strictly and thus read narrowly." Quadrant, 16 N.E.3d at 1172.  Courts interpreting no-action clauses should "give effect to the precise words and language used." Id.

### 1. Whether the No-Action Clause Applies to LL Funds' Contract Claims

The no-action clause in the MSTA provides in relevant part that: "No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this

Agreement, unless" the Certificateholder satisfies certain conditions.  Doc. 27-2 at 53.  LL

Funds' breach of contract claims plainly fall within the scope of the no-action clause because

they seek to enforce the terms of the MSTA itself.[2]  See Sterling, 2010 WL 3324705, at *3–5

(concluding that no-action clause with language substantially similar to the no-action clause in

this case applied to certificateholder's breach of contract claims); Quadrant, 16 N.E.3d at 1170,

1178 (holding that no-action clause applied to securityholder's contract claims where clause

precluded suits "upon or under or with respect to this Indenture").

    LL Funds' argument that it was not required to comply with the no-action clause at all is

unpersuasive. LL Funds' only support for such an argument is In re Oakwood Homes Corp., No.

02-13396(PJW), 2004 WL 2126514 (Bankr. D. Del. Sept. 22, 2004).  In Oakwood, the Delaware

bankruptcy court relied on the trustee exception set forth by the Second Circuit in Cruden, 957

F.2d at 968, to conclude that the plaintiff could sue the servicer of a trust despite failing to

comply with a no-action clause.  Oakwood, 2004 WL 2126514, at *3.  Courts applying New

York law like the Second Circuit was in Cruden have required compliance with no-action clauses

when the situation is not akin to asking the trustee to sue itself.  See Peak Partners, 191 F. App'x

at 126–27; SC Note, 934 F. Supp. 2d at 532; Sterling, 2010 WL 3324705, at *5.  Although the

plaintiff in Oakwood was not suing the trustee directly, the bankruptcy court interpreted the

plaintiff's claim as alleging that the servicer had given the trustee mistaken instructions on how

to distribute funds within the trust.  The bankruptcy court concluded that the servicer was

essentially acting as the trustee's agent when it gave the distribution instructions and that the

trustee and servicer could therefore both be liable for the mistake.  Given these circumstances,

---

[2]Because LL Funds' tort claims and RICO claim are being dismissed on other grounds, it is
unnecessary to determine whether the no-action clause applies to these claims.

the bankruptcy court concluded that the plaintiff's claim was analogous enough to a claim against the trustee that the no-action clause did not apply. Oakwood, 2004 WL 2126514 at *3.

In contrast to Oakwood, the claims in LL Funds' Complaint do not implicate Deutsche as Trustee, so there is no justification for applying the reasoning in Oakwood to this case. Moreover, since the decision in Oakwood, several courts have held that even when there are allegations of trustee misconduct, there remains a distinction between demanding that a trustee sue itself and demanding that the trustee sue a servicer or master servicer. Peak Partners, 191 F. App'x at 122–27 (concluding that no-action clause applied to claims against servicer in negligence suit against servicer and trustee); SC Note, 934 F. Supp. 2d at 532 ("[I]t is not akin to asking the trustee to bring an action against itself when the request is to sue a servicer or another manager of the trust, even if it may implicate some misconduct by the trustee."); Sterling, 2010 WL 3324705, at *5 ("There is an important difference between asking the trustee to sue itself—an 'absurd' requirement that we presume the parties did not intend—and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee."). The reasoning in Peak Partners, SC Note, and Sterling is more persuasive than the reasoning in Oakwood. LL Funds had a contractual obligation to comply with the no-action clause to invoke rights under the MSTA.

## 2. Whether the No-Action Clause Allows Suits Against Wells Fargo

Wells Fargo argues that because the no-action clause refers to an "Event of Default" rather than a "Master Servicer Event of Default," the clause only authorizes Certificateholder suits against the Servicer. The text of the MSTA provides some support for this argument, but contains conflicting language. As set forth above, the no-action clause provides in relevant part: "No Certificateholder shall have any right . . . to institute any suit, action or proceeding . . . with

14

respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default . . . ." Doc. 27-2 at 53. The MSTA refers to the Servicing Agreement for the definition of an "Event of Default." Doc. 27-1 at 31. The Servicing Agreement, in turn, defines an "Event of Default" as certain improper conduct by the Servicer. Doc. 30-1 at 53–54. The MSTA defines a "Master Servicer Event of Default" separately as various improper conduct by the Master Servicer. Doc. 27-2 at 33–35. Thus, Wells Fargo argues, the no-action clause should be construed as not allowing Certificateholders to sue the Master Servicer, but only to sue the Servicer for an Event of Default by the Servicer.

Yet § 9.11 of the MSTA supports a different interpretation of the no-action clause. Section 9.11 states in relevant part:

> <u>Limitation on Liability of the Master Servicer</u>. Neither the Master Servicer nor any of the directors, officers, employees or agents of the Master Servicer shall be under any liability to the Trustee, the Securities Administrator, the Servicer or the *Certificateholders* for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Master Servicer or any such person against any liability that would otherwise be imposed by reason of willful malfeasance, bad faith or negligence in the performance of its duties or by reason of reckless disregard for its obligations and duties under this Agreement.

Doc. 27-2 at 37 (italics added). The inclusion of Certificateholders in this provision limiting the Master Servicer's liability suggests that Certificateholders have some right to sue the Master Servicer under the MSTA.

Other portions of the MSTA further support interpreting the no-action clause as not precluding all Certificateholder suits against the Master Servicer. Section 9.04, which sets forth the definition of Master Servicer Events of Default, states:

> In each and every such case, so long as a Master Servicer Event of Default shall not have been remedied, in addition to whatever rights the Trustee may have at law or equity to damages, including injunctive relief and specific performance, the Trustee, by notice in writing to the Master Servicer, may, and (a) upon the request of the Holders of Certificates representing at least 51% of the Voting Rights (except with respect to any Master Servicer Event of Default related to a failure to comply with an Exchange Act Filing Obligation) or (b) the Depositor, in the case of a failure related to an Exchange Act Filing obligation shall terminate with cause all the rights and obligations of the Master Servicer under this Agreement.

Doc. 27-2 at 34. This paragraph can best be understood as allowing the majority of Certificateholders to remove the Master Servicer from its position should certain Master Servicer Events of Default remain unremedied. It would be strange to conclude that the parties to the MSTA intended to allow the Certificateholders to remove the Master Servicer for a Master Servicer Event of Default, but not allow them to sue the Master Servicer for the Default itself. In addition, at least one portion of the MSTA uses the term "Event of Default" more generally to refer to conduct by parties other than the Servicer. The Definitions section of the MSTA states that "with respect to the Securities Administrator, the Master Servicer, the Servicer and the Depositor only, the occurrence of an Event of Default under this Agreement" constitutes a "Reportable Event." Doc. 27-1 at 45. This suggests that the term "Event of Default" in this particular no-action clause is not limited to defaults by the Servicer.

Under New York law which governs the MSTA, the contract is to be read as a whole, Westmoreland Coal Co. v. Entech, Inc., 794 N.E.2d 667, 670 (N.Y. 2003), and no-action clauses "are to be construed strictly and thus read narrowly," Quadrant, 16 N.E.3d at 1172. On a motion to dismiss, this Court must draw all inferences in LL Funds' favor, making it reasonable to interpret the MSTA as allowing Certificateholders to sue the Master Servicer. Even if Wells Fargo's interpretation of the no-action clause is deemed reasonable as well, then the no-action

16

clause is ambiguous. See Am. Bldg. Maint. Co. of N.Y. v. Acme Prop. Servs., Inc., 515 F. Supp. 2d 298, 311 (N.D.N.Y. 2007) (applying New York law and explaining that a "contract that is susceptible to two reasonable interpretations is considered ambiguous"). When the language of a contract is ambiguous, "its construction presents a question of fact, which of course precludes summary dismissal" under Rule 12(b)(6). Paysys Int'l v. Atos SE, No. 14 Civ. 10105(SAS), 2015 WL 4533141, at *4 (S.D.N.Y. July 24, 2015) (quoting Maniolos v. United States, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010)).

### 3. Whether there was Sufficient Notice of Claims Against Wells Fargo

One of the requirements of the no-action clause is that the Certificateholder give the Trustee "a written notice of an Event of Default" prior to bringing suit. Doc. 27-2 at 53. Wells Fargo argues that LL Funds failed to comply with this requirement because its notice letter to the Trustee only addressed claims against Saxon. Although the notice letter mainly focuses on alleged events of defaults by Saxon, LL Funds accurately alleges in its complaint that the letter also requests that the Trustee "institute an action, suit or proceeding in its own name as Trustee against Saxon Mortgage Services, Inc. and/or any relevant affiliates acting through Morgan Stanley, and any other parties under the MSTA and/or documents incorporated into or related to the MSTA while Saxon was a Servicer, based on the grounds listed in this letter." Doc. 1-1 at 1; Doc. 1 at ¶ 3. Given that Wells Fargo was one of only three parties to the MSTA and was responsible for supervising Saxon's conduct, this statement, when construed in LL Funds' favor, gave sufficient notice of and requested a suit against Wells Fargo. Accordingly, LL Funds has pleaded sufficient facts to survive Wells Fargo's motion to dismiss for failure to comply with the no-action clause's notice requirement.

### 4. Whether the No-Action Clause Requires that Events of Default Be Continuing

17

The no-action clause states that before bringing suit, a Certificateholder must give the Trustee "a written notice of an Event of Default and of the continuance thereof." Doc. 27-2 at 53. Defendants argue that this language requires Certificateholders to give notice of a continuing or "live" Event of Default before they can bring suit. Defendants contend that because Saxon had ended its role as Servicer before LL Funds sent the notice letter to Deutsche, LL Funds was unable to give notice of a continuing Event of Default and its Complaint therefore must be dismissed for failure to comply with the no-action clause.

However, the phrase "continuance thereof" does not unambiguously establish that a Certificateholder must give notice of a "live" or active Event of Default. It is at least as plausible to interpret the phrase as simply requiring that the Event of Default remain uncured. Under this interpretation, LL Funds satisfied the no-action clause by alleging in its letter to Deutsche that Saxon had committed Events of Default and that these Defaults had not been corrected.

### 5. Whether the No-Action Clause Bars LL Funds' Claims Against Saxon for Failure to Give Notice

In the notice letter, LL Funds alleged that Saxon committed an Event of Default under § 11.01(d) of the Servicing Agreement. Doc. 1-1 at 2. Section 11.01(d) provides:

> [T]he failure by the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement or in the Custodial Agreement which continues unremedied for a period of 30 days after the date on which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Purchaser (the date of delivery of such notice, the "Notice Date"); provided, however, that in the case of a failure that cannot be cured within thirty (30) days after the Notice Date, the cure period may be extended if the Servicer can demonstrate to the reasonable satisfaction of the Purchaser that the failure can be cured and the Servicer is diligently pursuing remedial action . . . .

18

Doc. 30-1 at 54. Saxon argues that because LL Funds failed to give it notice and an opportunity to cure, the no-action clause bars LL Funds' claims against it. This Court disagrees.

New York law does "not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured." Giuffre Hyundai, Ltd. v. Hyundai Motor Am., 756 F.3d 204, 209 (2d Cir. 2014). Courts have found that compliance with a notice-and-cure provision is unnecessary when the "cure is unfeasible." Id. at 210 (quoting Sea Tow Servs. Int'l, Inc. v. Pontin, 607 F. Supp. 2d 378, 389 (E.D.N.Y. 2009)); see also Hicksville Mach. Works Corp. v. Eagle Precision, Inc., 635 N.Y.S.2d 300, 302 (N.Y. App. Div. 1995) (asserted "right to cure" irrelevant where "there was no evidence in the record to support the proposition that a cure was possible"). Here, Saxon had ceased working as the Servicer for the Trust by the time LL Funds sent its letter to Deutsche. Doc. 1 at ¶ 3. Drawing all inferences in LL Funds' favor, it would not have been feasible for Saxon to cure its alleged Events of Default when it was no longer the Servicer. Thus, LL Funds did not need to comply with the notice-and-cure provision in § 11.01(d) of the MSTA with regard to its contract-based claim against Saxon under these circumstances.

## C. Whether LL Funds' Claims are Sufficient under Rule 12(b)(6)

### 1. Contract Claims

Defendants make two main arguments for dismissal of LL Funds' breaches of contract claims, the first of which focuses on the Complaint's references to the Saxon Consent Order. Saxon argues that any references to the Saxon Consent Order are immaterial under Federal Rule of Civil Procedure 12(f) and therefore should be stricken. Similarly, Wells Fargo argues that references to the Saxon Consent Order should be disregarded because the Order is not a proper

19

basis for pleading liability. Defendants contend that once references to the Saxon Consent Order are stricken or set aside, LL Funds' breaches of contract claims fail.

Defendants' primary support for disregarding references to the Saxon Consent Order is the Second Circuit's decision in Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976). Lipsky was a breach of contract case in which the plaintiff sued the defendant for failing to use its "best efforts" to register the plaintiff's stock with the Securities Exchange Commission (SEC). 551 F.2d at 890. One of the plaintiff's arguments in support of his claim was that the defendants had filed a deficient registration statement with the SEC when attempting to register his stock. Id. at 891. Rather than alleging improprieties in this registration statement in his complaint, however, the plaintiff referenced allegations in an SEC complaint that the defendants had filed deficient registration statements when attempting to register other stock. Id. at 891–92. The defendants argued that because the SEC complaint had been settled by a consent judgment rather than an adjudication on the merits, any allegations referring to the SEC complaint should be struck as immaterial under Federal Rule of Civil Procedure 12(f). The district court agreed and dismissed the complaint with prejudice for failure to state a claim. Id.

The Second Circuit in Lipsky affirmed in part, holding that although the consent judgment and SEC complaint were immaterial under Rule 12(f), the district court should have given the plaintiff an opportunity to amend the complaint to plead facts about the registration statement for his stock. Id. at 893–94. To arrive at this conclusion, the Second Circuit began with the proposition that a Rule 12(f) motion to strike should be denied unless no evidence in support of the allegations would be admissible. Id. at 893. Next, the Second Circuit concluded that because the consent judgment was not the result of an adjudication on the merits, it would be inadmissible at trial and therefore was immaterial under Rule 12(f). Id. at 893–94. Because the

consent judgment was immaterial, the Second Circuit reasoned, so too was the SEC complaint that preceded it. Id. at 894. Accordingly, the Second Circuit held that "neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case." Id. at 893. However, the Second Circuit in Lipsky reversed the district court's dismissal being with prejudice. Id.

District courts have disagreed over how to interpret Lipsky. Some courts read Lipsky as meaning that "references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)." In re Merrill Lynch & Co. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003); see also Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc., No. 10-CV-864 (SLT)(RER), 2014 WL 3569338, at *4 (E.D.N.Y. July 18, 2014) (striking references to an FDIC consent order where the plaintiffs were relying on the consent order to show that the defendants had, in fact, failed to maintain an adequate allowance for estimated loan losses and had fraudulently understated delinquent loans); In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d 588, 593–94 (S.D.N.Y. 2011) (concluding that unajudicated CTFC findings were immaterial under Rule 12(f) when plaintiff was attempting to use findings to prove liability); Dent v. U.S. Tennis Ass'n, No. CV-08-1533 (RJD) (VVP), 2008 WL 2483288, at *2–3 (E.D.N.Y. June 17, 2008) (striking allegations derived from a settlement agreement with the attorney general where the plaintiff was relying on the settlement agreement to show that the defendant had engaged in discrimination in the past). Other courts have read Lipsky more narrowly. See Marvin H. Maurras Revocable Tr. v. Bronfman, Nos. 12 C 3395, 12 C 6019, 2013 WL 5348357, at *16 (N.D. Ill. Sept. 24, 2013) (concluding that when "a plaintiff does not make allegations about the *content* of an inadmissible

21

document but rather alleges independently sourced and appropriately supported facts that *track* . . . that inadmissible document's factual allegations," the allegations are not immaterial under Lipsky); VNB Realty, Inc. v. Bank of Am. Corp., No. 11 Civ. 6805(DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013) ("A close reading of Lipsky reveals that it does not mandate the elimination of material from a complaint simply because the material is copied from another complaint."); In re Fannie Mae 2008 Sec. Litig., 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) ("Lipsky does not, as defendants argue, stand for the proposition that any factual allegation derived from a government investigation or pleading must be stricken from a private plaintiff's complaint."); In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (explaining that although "some courts in [the Southern District of New York] have stretched the holding in Lipsky to mean that any portion of a pleading that relies on unajudicated allegations in another complaint is immaterial under Rule 12(f). . . . [n]either Circuit precedent nor logic supports such an absolute rule").

Lipsky can best be understood as requiring that references to a consent order be struck in certain situations, such as when a plaintiff is relying on the order for a purpose that would be inadmissible at trial, but not as establishing a rule that all references to a consent order are per se immaterial. With that understanding, this Court concludes that the main focus of Defendants' arguments—paragraphs 35 and 36 of the Complaint—do not deserve to be stricken. Paragraph 35 recites the Federal Reserve's allegations in the Saxon Consent Order after which paragraph 36 states:

> On information and belief, and as a result of Defendants' activities in these and other matters, Defendant Saxon filed in county recording or land offices and in courts flawed, misleading, improper and arguably unlawful documents as set forth in the above-referenced Consent Order with regard to the Trust. This

22

> conduct constituted negligence, gross negligence and/or bad faith
> and willful misfeasance.

Doc. 1 at ¶ 36.    Although inartfully pleaded, paragraphs 35 and 36 appear to allege that the

allegations in the Saxon Consent Order provide an accurate description of how Saxon serviced

the loans in the Trust. LL Funds is not relying on the Consent Order to prove that Saxon entered

into a settlement or to establish that the facts alleged in the Consent Order did, in fact, occur.

Rather, LL Funds appears to use the Consent Order to detail conduct that LL Funds alleges to

have taken place when Saxon serviced the Trust's loans.  Accordingly, this Court denies Saxon's

motion to strike paragraphs 35 and 36 and rejects Wells Fargo's argument that these paragraphs

should be disregarded.[3]

    Defendants' second main argument in support of dismissal asserts that LL Funds was

required to allege wrongdoing with respect to specific loans within the Trust.  According to

Defendants, the Second Circuit's decision in Retirement Board of the Policemen's Annuity &

Benefit Fund of Chicago v. Bank of New York Mellon, 775 F.3d 154 (2d Cir. 2014), petition for

cert. filed, (U.S. Sep. 14, 2015) (No. 14-314), requires LL Funds to plead their claims on a "loan-

by-loan" and "trust-by-trust" basis.  In Mellon, the plaintiffs in a putative class action alleged

that the trustee of over five hundred RMBS trusts had failed to take appropriate action when

mortgage loans within the trusts defaulted.  Id. at 156–57.  The question before the Second

Circuit in Mellon was whether the plaintiffs had standing to assert claims concerning certificates

issued by trusts in which the plaintiffs had never invested.  Id. at 156-57.  To demonstrate such

standing, the plaintiffs needed to show that the trustee's conduct that harmed the plaintiffs

"'implicate[d] the same set of concerns' as [the trustee's] alleged failure to take action with

---

[3]Saxon also moved to strike other paragraphs of the Complaint as immaterial under Rule 12(f).
Although this Court will disregard LL Funds' statement in paragraph 35 that the Federal Reserve
Board "found" that Saxon engaged in certain misconduct, Saxon's motion is otherwise denied.

respect to defaults in other trusts in which Plaintiffs did not invest." Id. at 161. The Second Circuit explained that the nature of the plaintiffs' claims—including allegations that the trustee had failed to notify the plaintiffs of breaches by the loan originator, failed to force the originator to repurchase defaulted loans, and failed to ensure that the loans were properly documented—required that the claims "be proved loan-by-loan and trust-by-trust." Id. at 162. Although the plaintiffs argued that evidence of the trustee's "policy of 'inaction' in the face of widespread defaults" would be applicable to all of the trusts, the Second Circuit reasoned that "even proof that [the trustee] *always* failed to act when it was required to do so would not prove [the plaintiffs'] case, because they would still have to show which trusts actually had deficiencies that required [the trustee] to act in the first place." Id. Given the "significant differences in the proof that will be offered for each trust," the Second Circuit held that the plaintiffs did not have standing to assert claims concerning trusts in which they had never invested. Id. at 163.

Although Mellon established that plaintiffs need to prove their claims "loan-by-loan and trust-by-trust" at trial, it did not hold that plaintiffs must *plead* their claims in this manner. Mellon does not impose a stricter pleading standard in cases involving RMBS. See Royal Park, 2015 WL 3466121, at *6 (concluding that Mellon did not "implicate plaintiffs' burden *at the pleading stage*" and rejecting argument that Mellon created "a heightened pleading requirement into the RMBS context"). Rather, even after Mellon, the relevant question under Rule 12(b)(6) in cases such as this is whether plaintiffs "have pleaded 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Iqbal, 556 U.S. at 678). Under this standard, LL Funds' breach of contract claims are sufficient.

24

There are four elements to a breach of contract claim under New York law: 1) the existence of a contract; 2) plaintiff's performance of the contract; 3) breach of the contract by defendants; and 4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). To properly plead a breach of contract claim, a plaintiff must identify the provisions of the contract that were breached and the "defendant's acts or omissions constituting the breach." Dilworth v. Goldberg, 914 F. Supp. 2d 433, 457–58 (S.D.N.Y. 2012).

In regard to Saxon's alleged breach of contract, LL Funds alleges in Count II that the MSTA and Servicing Agreement obligated Saxon to "employ the mortgage servicing practices of prudent mortgage lending institutions" and that Saxon breached this obligation by engaging in "numerous illicit and illegal acts with regard to its servicing of the mortgage loans in the Trust." Doc. 1 at ¶¶ 73–74. As an example, LL Funds alleges that Saxon "caused to be filed in state courts and federal bankruptcy courts false affidavits, improperly notarized affidavits, and otherwise failed to ensure that proper foreclosure processes were in place." Doc. 1 at ¶ 75. These allegations, along with the other factual content pleaded in the Complaint, allow for a reasonable inference that Saxon breached its contractual obligations. Although Saxon takes issue with paragraph 36 of the Complaint being based on "information and belief," plaintiffs may plead in this manner in certain situations, even after the Supreme Court's decisions in Iqbal and Twombly. See Pope v. Fed. Home Loan Mortg. Corp, 561 F. App'x 569, 573 (8th Cir. 2014) (per curiam) ("While plaintiffs may at times plead upon information and belief, . . . '[i]nformation and belief' does not mean pure speculation." (quotation omitted)). Specifically, the "Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (internal

25

quotation marks and citation omitted). In its brief, LL Funds asserts that pleading more specifically "loan-by-loan" is an "impossible and futile endeavor until discovery begins in this case." Doc. 33 at 13. Defendants counter that § 8.02 of the MSTA allows LL Funds to request the documents necessary to plead its claims with more specificity. Section 8.02 of the MTSA states that the "Custodian shall provide access to the Mortgage Loan documents in possession of the Custodian" upon request of various parties, including the Certificateholders. Doc. 27-2 at 18. Counsel for LL Funds claims that the documents allegedly robo-signed would be in possession of the Servicer rather than the Custodian. Doc. 42 at 73. Thus, § 8.02 appears not to be a vehicle for LL Funds to have obtained the documents needed to plead its claims with more specificity. Given these circumstances, LL Funds may appropriately plead certain matters on information and belief.

LL Funds alleges in Count I that Wells Fargo breached its obligation under the MSTA to ensure that Saxon "duly and punctually perform[ed]" its servicing duties. Doc. 1 at ¶¶ 63–66 (alteration in original). As Saxon's failure to perform its servicing duties, LL Funds invokes Saxon's alleged robo-signing. Doc. 1 at ¶ 65. Drawing all inferences in LL Funds' favor, the factual allegations in the Complaint make Count I plausible.

### 2. Tort Claims

Defendants argue that LL Funds' tort claims should be dismissed because they fail to state a basis for relief that is independent from the MSTA and Servicing Agreement. New York law governs the contract claims, but LL Funds asserts that South Dakota law applies to its tort claims. Saxon has no connection with South Dakota, but is based in Texas.[4] Regardless of

---

[4]Wells Fargo argues that New York law applies to LL Funds' tort claims against it, while Saxon contends that Texas law applies. LL Funds asserted for the first time at the hearing that South Dakota law governs its tort claims. Because LL Funds has failed to establish that Defendants

26

which state's law applies to the tort claims, the outcome is the same. Courts in New York, Texas, and South Dakota have all held that a breach of contract does not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. See UTex. Commc'ns Corp. v. Pub. Util. Comm'n, 514 F. Supp. 2d 963, 972 (W.D. Tex. 2007) (applying Texas law and explaining that a "defendant's conduct that breaches an agreement between the parties and does not breach an affirmative duty imposed outside the contract is not actionable in tort."); Sundt Corp. v. S.D. Dep't of Transp., 566 N.W.2d 476, 478 (S.D. 1997) ("[T]here can be no cause of action sounding in negligence unless there is a legal duty which arises independent of the duties under the contract."); Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193–94 (N.Y. 1987) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated. This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.") (internal citations omitted).

Here, LL Funds alleges in Count III that Defendants "had a duty to perform their servicing duties with due care" but failed to do so. As "one example," Count III states:

> Defendants were required to properly service the loans and to ensure any foreclosure activities were performed legally, and "*duly and punctually*," and in conformance with the practices "*of prudent mortgage lending institutions which service mortgage loans of the same type*" as the loans held in the Trust for the benefits of its Certificateholders.   As documented in the Consent Orders described in this Complaint, Defendants failed to properly and legally service the loans and perform their foreclosure activities.

---

owed it an independent duty under the law in New York, Texas, or South Dakota, it is unnecessary to engage in a choice of law analysis.

Doc. 1 at ¶¶ 84–85 (emphasis added). The emphasized language in this block quote comes directly from the MSTA and the Servicing Agreement. Doc. 27-2 at 30; Doc. 30-1 at 7. Similarly, Count IV, in which LL Funds alleges that Defendants engaged in "Willful Misfeasance/Misconduct or Gross Negligence," alleges that Defendants "had a duty to perform their servicing duties with due care" and "the obligation not to act with willful misconduct or willful misfeasance." Doc. 1 at ¶¶ 92–93. At bottom, LL Funds in Counts III and IV is seeking to enforce obligations the Defendants contractually undertook in the MSTA and the Servicing Agreement. The misconduct and damages alleged in Counts III and IV are essentially the same as the misconduct and damages alleged in LL Funds' breaches of contract claims. Because LL Funds has failed to plead any facts or cite any cases suggesting that Defendants have an independent duty under tort to perform the obligations under the MSTA and Servicing Agreement, Counts III and IV fail to state claims upon which relief can be granted.

LL Funds makes three arguments to avoid this conclusion, none of which are persuasive. First, LL Funds argued in its brief that Defendants have a duty to "service borrowers' mortgage loans in compliance with all applicable laws," that is independent of their duties under the MSTA and the Servicing Agreement. Doc. 33 at 14. At the hearing, counsel for LL Funds contended that this duty arose out of Defendants' performance of professional services. Courts in New York, Texas, and South Dakota have recognized that certain professionals "may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties." Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1369 (N.Y. 1992); Kreisers Inc. v. First Dakota Title Ltd. P'ship, 852 N.W.2d 413, 420 (S.D. 2014) (recognizing that a provider of professional services may have an independent duty to perform the services with reasonable care); Averitt v. PriceWaterhouseCoopers L.L.P., 89 S.W.3d 330, 334 (Tex. Ct. App. 2002)

28

("Whether a written contract providing for professional services exists between a professional and his client or not, a cause of action based on the alleged failure to perform a professional service is a tort rather than a breach of contract."). "Professionals" who have an independent duty to exercise reasonable care include lawyers, Univ. Nat'l Bank v. Ernst & Whinney, 773 S.W.2d 707, 710 (Tex. Ct. App. 1989), accountants, O'Bryan v. Ashland, 717 N.W.2d 632 (S.D. 2006); Cumin Ins. Soc'y Inc. v. Tooke, 739 N.Y.S.2d 489, 492–93 (N.Y. App. Div. 2002) Univ. Nat'l Bank, 773 S.W.2d at 710; veterinarians, Limpert v. Bail, 447 N.W.2d 48, 51 (S.D. 1989), doctors, Martinmaas v. Engelmann, 612 N.W.2d 600 (S.D. 2000), and architects, Liberty Mut. Ins. Co. v. N. Picco & Sons Contracting Co., No. 05 Civ. 217(SCR), 2008 WL 190310, at *17 (S.D.N.Y. Jan. 16, 2008). Courts also have found an independent duty when a party holds itself out to the plaintiff as an expert in a particular area. See William Wrigley Jr. Co. v. Waters, 890 F.2d 594, 602–03 (2d Cir. 1989) (finding duty of care under New York law outside contract was imposed by law when defendants held themselves out as experts in trademark law); see also Kreisers, 852 N.W.2d at 420–21 (holding that company owed independent duty of care to ascertain what type of like-kind property exchange client wanted where company advertised that it performed exchanges without limitation but did not actually perform the type of complex exchange the client desired).

Here, LL Funds has not cited any cases holding that the servicer or master servicer of a mortgage-backed securities trust perform "professional" services that give rise to an independent duty of care. Nor has LL Funds pleaded any facts or offered any argument suggesting that the work of a mortgage servicer or master servicer is analogous to professions where courts have found such an independent duty. And while LL Funds has alleged that Defendants entered into contracts in which they agreed to perform services in regard to the Trust, this alone does not

29

establish that LL Funds may sue Defendants in tort. See Niagra Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 725 F. Supp. 656, 666 (N.D.N.Y. 1989) ("The mere fact that the alleged breach involved a contract that encompassed the performance of services does not suffice as special additional allegations of wrongdoing which amount to 'a breach of a duty distinct from, or in addition to, the breach of a contract.'" (quoting N. Shore Bottling Co., v. C. Schmidt & Sons, Inc., 239 N.E.2d 189, 193 (N.Y. 1968))).

Second, LL Funds argued at the hearing that under the Sommer decision, Defendants had an independent duty to perform their obligations under the MSTA and the Servicing Agreement. According to LL Funds, this duty arose out of the public importance of Defendants' obligations. In Sommer, the Court of Appeals of New York held that a fire alarm company owed its client a duty of reasonable care that was independent of the company's contractual obligations. 593 N.E.2d at 1370. The court reasoned that the fire alarm company's duty arose out of the nature of the services it was providing, in which there was a significant public interest. Id. ("Fire alarm companies . . . perform a service affected with a significant public interest; failure to perform the service carefully and competently can have catastrophic consequences."). Although the public has some interest in having the servicers of RMBS trusts perform their obligations in a non-negligent manner, this interest is a far cry from the protection of the personal safety of citizens that was at issue in Sommer. The Sommer decision does not justify imposing a tort duty independent of contractual obligations on these Defendants in this case.

Third, LL Funds argues that it should be allowed to assert its tort claims because § 9.11 of the MSTA and § 8.02 of the Servicing Agreement "carve out of their coverage any contractual liability for Defendants' negligence." Doc. 33 at 14. Section 9.11 of the MSTA states in relevant part:

>　　Limitation on Liability of the Master Servicer. Neither the Master
> Servicer nor any of the directors, officers, employees or agents of
> the Master Servicer shall be under any liability to the Trustee, the
> Securities Administrator, the Servicer or the Certificateholders for
> any action taken or for refraining from the taking of any action in
> good faith pursuant to this Agreement, or for errors in judgment;
> provided, however, that this provision shall not protect the Master
> Servicer or any such person against any liability that would
> otherwise be imposed by reason of willful malfeasance, bad faith
> or negligence in the performance of its duties or by reason of
> reckless disregard for its obligations and duties under this
> Agreement. . . .

>　　The Master Servicer shall not be liable for any acts or
> omissions of the Servicer except to the extent that damages or
> expenses are incurred as a result of such act or omissions and such
> damages and expenses would not have been incurred but for the
> negligence, willful malfeasance, bad faith or recklessness of the
> Master Servicer in supervising, monitoring and overseeing the
> obligations of the Servicer as required under this Agreement.

Doc. 27-2 at 37–38. Similarly, Section 8.02 of the Servicing Agreement provides in part:

>　　Limitations on Liability of Servicer and Others. Neither the
> Servicer nor any of the directors, officers, employees or agents of
> the Servicer shall be under any liability to the purchaser for any
> action taken or for refraining from the taking of any action in good
> faith pursuant to this Agreement, or for errors in judgment,
> provided, however, that this provision shall not protect the Servicer
> or any such person against any breach of warranties or
> representations made herein, its own negligent actions, or failure to
> perform its obligations in compliance with any standard of care set
> forth in this Agreement, or any liability which could otherwise be
> imposed by reason of any breach of the terms and conditions of
> this Agreement.

Doc. 31-1 at 47. This "carve-out language," however, does not excuse LL Funds from

identifying an independent duty that would require Defendants to perform their obligations under

the MSTA and the Servicing Agreement. See BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,

949 F. Supp. 2d 486, 506–08 (S.D.N.Y. 2013) (concluding that language in trust agreement

carving out claims of negligence did not relieve plaintiff of identifying a duty independent of the

agreement). Because LL Funds has failed to identify such a duty, Counts III and IV of the Complaint are dismissed.

### 3. RICO Claim

"RICO provides a private right of action for any person 'injured in his business or property by reason of a violation of' its substantive provisions." Dahlgren v. First Nat'l Bank of Holdrege, 533 F.3d 681, 689 (8th Cir. 2008) (quoting 18 U.S.C. § 1964(c)). LL Funds alleges in Count V of the Complaint that Wells Fargo violated § 1962(c) of the RICO Act. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a claim under § 1962(c), LL Funds must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Stonebridge Collection, Inc. v. Carmichael, 791 F.3d 811, 822–23 (8th Cir. 2015) (quoting Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir. 2009)).

RICO defines "racketeering activity" as numerous so-called predicate acts, including mail fraud, wire fraud, bank fraud, and obstruction of justice. 18 U.S.C. § 1961(1). To plead a pattern of racketeering activity, a plaintiff must allege "two or more related [predicate] acts . . . that 'amount to or pose a threat of continued criminal activity.'" Nitro Distrib., 565 F.3d at 428 (quoting Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir. 1999)). A plaintiff relying on fraud as a predicate act under RICO must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995) (applying Rule 9(b) to allegations of fraud used as predicate acts for RICO claims). "The '[c]ircumstances' of the fraud include 'such matters as the time,

place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" H & Q Props., Inc. v. Doll, 793 F.3d 852, 846 (8th Cir. 2015) (alteration in original) (quoting Murr Plumbing, 48 F.3d at 1069)). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b)]." Drobnak v. Anderson Corp., 561 F.3d 778, 783 (8th Cir. 2009) (first alteration in original) (quoting Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 746 (8th Cir. 2002)).

LL Funds alleged in the Complaint that Wells Fargo engaged in a pattern of racketeering activity by committing mail and wire fraud in violation of federal law and perjury and subornation of perjury in violation of South Dakota law. Perhaps recognizing the shaky foundations for its RICO claim, LL Funds alleges in its brief that Wells Fargo also committed bank fraud and obstruction of justice.

### i. Wire and Mail Fraud

"When plead as RICO predicate acts, mail and wire fraud require a showing of: (1) a plan or scheme to defraud, (2) intent to defraud, (3) reasonable foreseeability that the mail or wires will be used, and (4) actual use of the mail or wires to further the scheme." Wisdom, 167 F.3d at 406. Under Crest Construction II, Inc. v. Doe, 660 F.3d 346, 358 (8th Cir. 2011), to state a RICO claim based on wire and mail fraud, plaintiffs under Rule 9(b) must allege the who, what, when, where, and how of wire and mail fraud.[5] LL Funds does not meet this standard.

---

[5]This Court recognizes that a mailing or wire communication need not be fraudulent on its face to constitute an act of wire or mail fraud. In the present case, however, LL Funds is claiming that the mailings and wire communications themselves were "false and fraudulent." LL Funds has not pleaded any facts to suggest that Wells Fargo used factually accurate mailings or wire communications as part of a scheme to defraud.

LL Funds alleges that Wells Fargo engaged in a scheme to defraud the Trust and the Trust's Certificateholders by "committing acts of robo-signing and the other improper and illegal servicing practices alleged in this Complaint." Doc. 1 at ¶ 105; see also Doc. 33 at 34 ("Plaintiff has alleged that Defendant Wells Fargo engaged in a scheme to defraud the Trust and the Trust's certificateholders and that Wells Fargo used the mail and the wires in furtherance of that scheme."). "Specifically," LL Funds alleges, "Wells Fargo intended to defraud Plaintiff (and the residential mortgage industry as a whole) when it created and facilitated the circulation of false and fraudulent documents submitted in connection with its foreclosure practices, and when it mailed to borrowers their mortgage loan statements containing improper servicing fees." Doc. 1 at ¶ 106. LL Funds' allegations, however, that Wells Fargo engaged in robo-signing and other illegal servicing practices are based mainly on either consent orders between Wells Fargo and two federal agencies or a complaint by the United States against Wells Fargo and other banks that ultimately resulted in Wells Fargo entering into a consent judgment.[6] Doc. 1 at ¶¶ 33, 42, 43. As explained above, a plaintiff may not rest its allegations in a complaint wholly on unadjudicated consent orders or unadmitted complaints to establish that the defendant did, in fact, engage in the conduct alleged therein. See Lipsky, 551 F.2d at 893–94; Waterford Twp. Police & Fire Ret. Sys., 2014 WL 3569338, at *4; In re Platinum & Palladium Commodities Litig., 828 F. Supp. 2d at 593–94; Dent, 2008 WL 2483288, at *2–3.

The Eighth Circuit likewise has been reluctant to accept reference to a consent agreement as establishing that a defendant engaged in misconduct, even at the pleading stage. See Insulate SB, Inc. v. Advanced Finishing Sys., Inc., 797 F.3d 538, 546 n.7 (8th Cir. 2015). The plaintiff in Insulate SB argued that the Eighth Circuit should infer that the defendant violated antitrust laws

---

[6]The Complaint also bases its allegations of robo-signing on a Memorandum of Review by the Office of the Inspector General. Doc. 1 at ¶¶ 40, 41, 44.

34

based on an FTC complaint against the defendant and a corresponding consent agreement. Id.

The Eighth Circuit declined to draw such an inference, explaining that the consent agreement not

only involved an entirely different antitrust dispute, but also explicitly stated that the defendant

was not admitting its guilt. Id. Although the Eighth Circuit granted the plaintiff's request to take

judicial notice of the FTC complaint, it declined "to consider the [complaint] as evidence [the

defendant] actually engaged in any anticompetitive conduct alleged therein." Id. at 543 n.4.

LL Funds' allegations that Wells Fargo engaged in a scheme to defraud the Trust and its

Certificateholders are based on conduct of Wells Fargo separate and apart from the Trust.  LL

Funds bases its allegations on Wells Fargo's alleged conduct as a mortgage servicer on loans

outside of the Trust.  However, for the Trust at issue here, Wells Fargo was the Master Servicer,

a role distinct from being a mortgage servicer.  Indeed, during the time relevant to this

Complaint, Saxon—and not Wells Fargo—was the Servicer.  LL Funds for its RICO claim

against Wells Fargo alleges no specific conduct concerning the Trust, but relies instead on

consent orders and the like—the very material Lipsky and its progeny declare cannot form the

sole basis of a claim.

Unlike with its breaches of contract claims where LL Funds cites the Saxon Consent

Order involving Saxon's mortgage-servicing conduct and then alleges that Saxon engaged in the

same mortgage-servicing conduct with regard to the Trust, the substance of the RICO claim

against Wells Fargo lacks any connection to conduct involving the Trust or LL Funds' holdings.

Unlike with the breach of contract claim where this Court does not have to take as true

allegations of the Saxon Consent Order to make the breaches of contract claims plausible, the

RICO claim against Wells Fargo requires this Court to assume the truth of the consent orders and

35

government investigations and findings to support any predicate act. In short, the wire and mail fraud allegations fail.

### ii. Bank Fraud

LL Funds alleges in its brief that Wells Fargo committed bank fraud under 18 U.S.C. § 1344, "when it instructed its employees to robo-sign and falsify various mortgage-related documents and then subsequently filed those fraudulent documents in various courts, local land record and other government agencies." Doc. 33 at 36. Section 1344 makes it a crime to

> knowingly execute[], or attempt[] to execute, a scheme or artifice—
>   (1) to defraud a financial institution; or
>   (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

18 U.S.C. § 1344. By its terms, then, § 1344 only applies to schemes that have at least some connection to a "financial institution," a term that is defined in 18 U.S.C. § 20.

Here, LL Funds not only neglected to identify the financial institution it claims was harmed, but also failed to plead any facts suggesting that this entity qualified as a financial institution as that term ·is defined in 18 U.S.C. § 20. Under these circumstances, LL Funds' invocation of bank fraud in its brief is insufficient under Rule 9(b) and Rule 12(b)(6) to preserve the RICO claim. See Viviani v. Vahey, No. 2:10-cv-01445-LRH-GWF, 2011 WL 3048733, at *3 (D. Nev. July 25, 2011) ("Without specific facts showing that each Plaintiff qualifies as a protected financial institution, Plaintiffs have not sufficiently plead acts of bank fraud under section 13[4]4 . . . ."); Holmes v. MBNA Am. Bank, N.A., No. 5:05-cv-16, 2007 WL 952017, at *1 (W.D.N.C. Mar. 27, 2007) (dismissing bank fraud claim where plaintiff failed to plead suggesting that the entity harmed was a financial institution). Because LL Funds' claims of wire,

mail, and bank fraud all fail, it is unnecessary to analyze whether LL Funds' claim that Wells Fargo engaged in obstruction of justice can serve as a predicate act under RICO.

## IV.    Conclusion

For the reasons explained above, it is hereby

ORDERED that Defendant Wells Fargo's Motion to Dismiss, Doc. 25, and Saxon's Motion to Dismiss, Doc. 28, are granted in part and denied in part, in that Counts III, IV, and V of the Complaint are dismissed without prejudice. It is further

ORDERED that Plaintiff is granted leave to file an Amended Complaint within twenty-one days of the date of this order to allege that it was a Certificateholder at the time of the transactions complained, as well as when Saxon's alleged breach of contract occurred and when LL Funds purchased its Certificates. It is further

ORDERED that Plaintiff has twenty-one days within which to file the supplemental brief as set forth in III.A. above, that Defendants have twenty-one days to respond, and that Plaintiff has fourteen days thereafter to file a reply, if Plaintiff chooses to do so.

DATED this 30th day of September, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE