UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION



**FILED**

AUG - 8 2016

CLERK

| | |
|---|---|
| GSAA HOME EQUITY TRUST 2006-2, BY AND THROUGH LL FUNDS LLC,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., AND SAXON MORTGAGE SERVICES, INC.,<br><br>Defendants. | 4:14-CV-04166-RAL<br><br><br>OPINION AND ORDER DENYING MOTIONS TO DISMISS CONTRACT CLAIMS |

Plaintiff GSAA Home Equity Trust 2006-2 (the Trust) is a residential mortgage-backed securities trust for which Defendant Wells Fargo, N.A. (Wells Fargo) was the Master Servicer and Defendant Saxon Mortgage Services, Inc. (Saxon) was the Servicer. LL Funds LLC (LL Funds), a Certificateholder in the Trust, filed suit in this Court on behalf of the Trust asserting breach of contract and tort claims against both Defendants and a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, against Wells Fargo. Doc. 1. In a previous Opinion and Order Granting in Part and Denying in Part Motions to Dismiss, this Court dismissed LL Funds' tort and RICO claims but declined to dismiss its contract claims. Doc. 44; GSAA Home Equity Tr. 2006-2 ex rel. LL Funds LLC v. Wells Fargo Bank, N.A., 133 F. Supp. 3d 1203 (D.S.D. 2015). Because there remained unanswered questions about LL Funds' standing to sue the Defendants on behalf of the Trust, this Court granted LL Funds leave to amend its complaint to establish standing and allowed it to file a supplemental

1

brief should it chose to do so. Doc. 44. LL Funds on behalf of the Trust filed an amended complaint, Doc. 45, and supplemental briefs, Docs. 46, 52, and Defendants both filed supplemental briefs in response, Docs. 49, 50. For the reasons explained below, LL Funds has standing to sue and can sue Saxon directly.

## I. Facts

The Trust was established in January 2006 by a Master Servicing and Trust Agreement (MSTA). Doc. 45 at ¶¶ 1–2. The parties to the MSTA were GS Mortgage Securities Corporation as Depositor; Deutsche Bank National Trust Company (Deutsche) as Trustee and Custodian; and Wells Fargo as Master Servicer. Doc. 45 at ¶ 2. As the Master Servicer, Wells Fargo had a duty under the MSTA to "monitor the performance of the Servicer under the related Servicing Agreements" and to "use its reasonable good faith efforts to cause the Servicer to duly and punctually perform their duties and obligations thereunder." Doc. 27-2 at 30; Doc. 45 at ¶ 21.

Section 12.07 of the MSTA contains a "no-action clause" requiring Certificateholders to satisfy several requirements before bringing suit:

> No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of an Event of Default and of the continuance thereof, as herein provided, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee, for 60 days after its receipt of such notice, request and offer of indemnity shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trustee, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself

2

> or themselves of any provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain or seek to obtain priority over or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders. For the protection and enforcement of the provisions of this Section 12.07, each and every Certificateholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Doc. 27-2 at 53. New York law governs the MSTA. Doc. 27-2 at 51.

Saxon agreed to be the Servicer for the loans in the Trust by entering into a Flow Servicing Rights Purchase and Servicing Agreement (Servicing Agreement) with Goldman Sachs Mortgage Company in December 2005. Doc. 45 at ¶ 5; Doc. 27-1 at 46. Saxon had a duty under the Servicing Agreement to ensure that its mortgage servicing practices conformed with those of prudent mortgage lending institutions which service similar mortgage loans. Doc. 45 at ¶ 20; Doc. 30-1 at 7, 22, 24. Goldman Sachs Mortgage Company eventually assigned its rights under the Servicing Agreement to GS Mortgage Securities Corporation (Step 1 Assignment), Doc. 51-1, who in turn assigned these rights to Deutsche as Trustee (Step 2 Assignment), Doc. 51-2.

LL Funds owns and holds certificates issued under the MSTA evidencing 25% or greater of the voting rights of the Trust. Doc. 45 at ¶¶ 3, 10. In March 2014, after Saxon no longer was servicing loans in the Trust, LL Funds sent a letter to Deutsche requesting it to sue Saxon and "any other parties under the MSTA . . . while Saxon was a Servicer" for, among other things, breach of contract and negligence. Doc. 45 at ¶ 3; Doc. 45-1 at 1. LL Funds explained in the letter that it was making a written request under § 12.07 of the MSTA for Deutsche to institute an action in its own name as Trustee. Doc. 45 at ¶ 3; Doc. 45-1 at 1–2. LL Funds further explained that it had not given a separate notice of an Event of Default under § 12.07 because Saxon was no longer the Servicer for the Trust and could not remedy the conduct in question.

Doc. 45 at ¶ 3; Doc. 45-1 at 2. To the extent that a separate notice of an Event of Default was necessary, however, LL Funds asked Deutsche to consider the letter as providing such notice. Doc. 45-1 at 2.

After Deutsche allowed more than sixty days to pass without bringing suit, LL Funds filed its complaint on behalf of the Trust against Saxon and Wells Fargo. Doc. 1 at ¶ 3. Saxon and Wells Fargo moved to dismiss, arguing among other things that LL Funds lacked standing to sue. According to Saxon and Wells Fargo, LL Funds' claims were derivative.[1] To have standing to bring a derivative suit, however, a plaintiff must be a shareholder, or in this case a certificateholder, at the time of the wrong alleged. Fed. R. Civ. P. 23.1(b)(1); N.Y. Bus. Corp. Law § 626(b); Kaliski v. Bacot (In re Bank of N.Y. Derivative Litig.), 320 F.3d 291, 297 (2d Cir. 2003) (explaining that under both Rule 23.1 of the Federal Rules of Civil Procedure and New York Business Corporation Law § 626(b), a plaintiff must have owned stock at the time of the transaction complained of to have standing to bring a shareholder derivative action); Fed. Hous. Fin. Agency v. WMC Mortg., LLC, No. 13 Civ. 584(AKH), 2013 WL 5996530, at *1 (S.D.N.Y. June 12, 2013) (applying Rule 23.1 to derivative suit by certificateholders in mortgage-backed securities trusts); SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A., 934 F. Supp. 2d 516, 528–29 (E.D.N.Y. 2013) (applying Rule 23.1 and New York Business Corporation Law § 626(b) to derivative suit brought by certificateholder in mortgage-backed securities trust), aff'd, 548 F. App'x 741 (2d Cir. 2014). Because LL Funds had failed to allege that it owned certificates at the time of the wrongs it complained of, Saxon and Wells Fargo argued that LL Funds' complaint had to be dismissed. Saxon argued in the alternative that even if LL Funds' claims were direct

---

[1]Wells Fargo later withdrew its argument that LL Funds' claims were derivative. Doc. 37.

rather than derivative, LL Funds still lacked standing under New York General Obligation Law § 13-107 and did not have a contractual relationship with Saxon in any event.

This Court in its previous opinion noted that whether LL Funds' claims were direct or derivative was a difficult question which the parties had failed to analyze under the appropriate test and that LL Funds had failed to allege whether it was a Certificateholder during the time Saxon was the Trust's Servicer. Accordingly, this Court gave LL Funds an opportunity to amend its complaint to aver that it owned certificates in the Trust at the time of the alleged wrongdoing. Alternatively, this Court allowed LL Funds to file a supplemental brief "explaining why and how this is a direct action" such that LL Funds would not need to comply with Rule 23.1 and New York Business Corporation Law § 626 to establish its standing to sue. Doc. 44 at 10. This Court gave all parties an opportunity to further brief the issues framed by this Court.

In response, LL Funds submitted an amended complaint alleging that it purchased certificates in the Trust on December 17, 2009, and that it owned these certificates when Defendants' alleged breaches of contract occurred. Doc. 45 at ¶¶ 10, 84. Like LL Funds' initial complaint, the amended complaint states that LL Funds seeks damages for the entire Trust. See, e.g., Doc. 45 at ¶ 3 ("LL Funds brings this action in the name of the Trust for the 'common benefit of all Certificateholders' affected by the actions of the Defendants."); Doc. 45 at ¶ 72 ("Plaintiff [meaning the Trust] and its Certificateholders who have suffered and continue to suffer damages as a result of Wells Fargo's breach of contract should be compensated."). LL Funds also submitted a supplemental brief asserting that its claims are direct under the test articulated in Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004) (en banc).

Wells Fargo responded by arguing that LL Funds cannot seek damages for the entire Trust in a direct action. According to Wells Fargo, allowing such a claim would permit LL Funds to obtain the benefit of damages under Rules 23 and 23.1 without having to meet the procedural requirements of those rules. Wells Fargo asked this Court either to limit LL Funds' damages claim to any damages incurred by LL Funds or to direct LL Funds to amend its complaint to reflect such a limit. Saxon seconded Wells Fargo's argument that LL Funds cannot seek Trust-wide damages in a direct suit, but also claimed that LL Funds' direct claim against it must fail for lack of a contractual relationship. As for the standing issue, however, Saxon conceded that LL Funds has alleged facts sufficient to establish its standing at the pleading stage. This Court addresses Saxon's contract argument first before turning to the Defendants' arguments about damages.

## II. Analysis

### A. LL Funds May Sue Saxon Directly for Breach of Contract

LL Funds argues that Saxon breached the MSTA and the Servicing Agreement by failing to employ prudent servicing practices. Doc. 45 at ¶¶ 76–79. Saxon contends that LL Funds cannot sue it for breach of contract because Saxon is not a party to the MSTA and LL Funds is not a party to the Servicing Agreement. LL Funds disagrees, arguing among other things that it is a third-party beneficiary because every action taken as to the mortgage loans in the Trust was for the benefit of the Certificateholders.

A plaintiff qualifies as a third-party beneficiary if there exists a valid and binding contract between other parties, the contract was intended for the plaintiff's benefit, and the benefit to the plaintiff "is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate [the plaintiff] if the benefit is lost." Cal. Pub. Emps.'

6

Ret. Sys. v. Shearman & Sterling, 741 N.E.2d 101, 104 (N.Y. 2000) (quotation omitted).  Put another way, "a third party may enforce a contract when 'recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'"  Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 52 (2d Cir. 2012) (quoting Levin v. Tiber Holding Corp., 277 F.3d 243, 248 (2d Cir. 2002)). "In determining whether the parties intended to benefit the third party, a court 'should consider the circumstances surrounding the transaction as well as the actual language of the contract.'" Id. (quoting Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124 (2d Cir. 2005)). "[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant, or where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." Id. at 52–53 (alteration in original) (quoting Subaru Distribs. Corp., 425 F.3d at 124).

LL Funds argues that the MSTA and the Step 2 Assignment show an intent to benefit Certificateholders like itself.  Under New York law "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998).  Contracts executed on different dates "should be interpreted together if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993) (quotation and internal quotation marks omitted).  "Whether multiple writings should be construed as one

agreement depends upon the intent of the parties." Id. at 52–53. The intent of the parties is generally a fact question for the jury, but when "the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005).

The MSTA and the Step 2 Assignment at least arguably should be interpreted as a single contract, especially in the context of ruling on this motion to dismiss. The MSTA and Step 2 Assignment were components of a larger design to securitize the loans in the Trust for sale to investors. The Step 2 Assignment, to which Saxon and Deutsche were parties, incorporated the terms of the Servicing Agreement, Doc. 51-2 at 4, and provided that GS Mortgage Securities Corporation was transferring to Deutsche its rights under the Servicing Agreement and the mortgage loans that made up the corpus of the Trust, Doc. 51-2 at 3–4. Saxon acknowledged in the Step 2 Assignment that it would service the mortgage loans "for the benefit" of Deutsche and that it would be subject to the supervision of Wells Fargo, as Master Servicer of the Trust. Doc. 51-2 at 4–5. The Step 2 Assignment makes several references to the MSTA, including relying on the MSTA to define terms used in the Step 2 Assignment and describing Wells Fargo's obligations should it choose to terminate the Trust under § 11 of the MSTA. Doc. 51-2 at 7; see also Doc. 51-2 at 3, 5.

The MSTA makes similar references to the Step 2 Assignment and Servicing Agreement. The MSTA includes a copy of the Servicing Agreement as an exhibit, Doc. 27-1 at 6, defines the Step 2 Assignment and refers to its description of Saxon's reporting requirements, Doc. 27-1 at 47; Doc. 27-2 at 14, and relies on the Servicing Agreement to define "Events of Default" as to Saxon, Doc. 27-1 at 31; Doc. 27-2 at 15. The MSTA also provides that Wells Fargo "shall monitor the performance of [Saxon] under the related Servicing Agreements," Doc. 27-2 at 30,

discusses terminating Saxon's obligations should the Trust property be sold, Doc. 27-2 at 46, and explains that the Servicing Agreement may be amended under certain circumstances, Doc. 27-2 at 48–50.  The interlocking nature of the Step 2 Assignment and the MSTA at least suggests that the parties intended for the contracts to be construed together.[2]  Indeed, neither contract would make much sense without the other: No investors would purchase trust certificates without a servicer to manage the mortgage loans and there would be no need for a servicer absent a securities trust.

Drawing all inferences in LL Funds' favor and reading the Step 2 Assignment and the MSTA as one contract, it is plausible that LL Funds is a third-party beneficiary who can sue Saxon directly.  When Deutsche entered into the MSTA in January 2006, it agreed to hold the mortgage loans and the "Trust Fund" for the benefit of Certificateholders.  See Doc. 27-1 at 51; Doc. 27-1 at 55.  Shortly thereafter, in February 2006, Deutsche entered into the Step 2 Assignment with Saxon.  Doc. 51-2.  Under the Step 2 Assignment, Saxon agreed to service the mortgage loans for Deutsche's benefit.  Doc. 51-2 at 4.  Saxon's servicing duties included collecting mortgage loan payments and remitting these payments to the Trust, Doc. 30-1 at 26–28, engaging in loss mitigation efforts with delinquent borrowers, Doc. 30-1 at 22–23, and pursuing foreclosure proceedings on the Trust's behalf, Doc. 30-1 at 24–25. These duties were critical to Certificateholders making money on their investments.  See 4C Robert L. Haig, New York Practice Series: Commercial Litigation in New York State Courts § 91.6 (4th ed. updated Sept. 2015) ("The ability of the servicer to maximize collections on the securitized pool of loans

---

[2]The mere fact that the MSTA and Step 2 Assignment cross-reference each other for definitions does necessarily make them a single contract of course.  See Grand Manor Health Related Facility, Inv. v. Hamilton Equities, Inc., 941 F. Supp. 2d 406, 419 (S.D.N.Y. 2013) ("[W]hile each regulatory agreement may be used to determine the meaning of any ambiguous terms in the other agreement, that does not make them one contract that gives a party rights in an agreement to which that party was not a signatory.").

9

is a key factor in the outcome of any securitization transaction."). Under the MSTA, Deutsche would distribute the money Saxon collected from the borrowers to the Trust's Certificateholders. Doc. 45 at ¶ 16. Deutsche's role as Trustee, its commitment to hold the mortgage loans for the benefit of the Certificateholders, and the fact that Saxon's servicing obligations were designed to provide Certificateholders a return on their investments all indicate that Deutsche intended to give Certificateholders such as LL Funds the benefit of Saxon's promise to service the mortgage loans, including Saxon's promise to service the loans in a prudent manner. Haig, supra, § 91.6 ("[T]he 'servicer' . . . interacts with the obligors on the underlying loans to collect payments owed on the loans and deposits those payments in the securitization trust account for the benefit of the issuing entity and, ultimately, the investors.").

Other portions of the MSTA also suggest that Deutsche intended that Saxon's promise to service the mortgage loans in the Trust inure to the Certificateholders' benefit. For instance, § 7.01 of the MSTA allows a majority of the Certificateholders to remove Saxon from its position as Servicer should a Servicer Event of Default remain unremedied. Doc. 27-2 at 15. It would be strange to conclude that the parties intended to allow the Certificateholders to remove Saxon for a Servicer Event of Default, but not allow them, upon satisfying § 12.07 of the MSTA, to sue Saxon for the Default itself. Additionally, § 9.01 of the MSTA states that Wells Fargo as Master Servicer will "monitor the performance of the Servicer under the related Servicing Agreements," on "behalf of the Trustee, the Securities Administrator, the Depositor, and *the Certificateholders*." Doc. 27-2 at 29–30 (emphasis added). Finally, the no-action clause's explanation concerning how Certificateholders may bring suit if there is an Event of Default arguably evinces an intent to allow Certificateholders to enforce Saxon's obligations under certain circumstances.

Saxon argues that LL Funds cannot be a third-party beneficiary of the Servicing Agreement because the Step 1 Assignment to the Servicing Agreement contains a provision identifying Wells Fargo as "sole third-party beneficiary." Doc. 50 at 4. This provision actually reads:

> Section 16 Third-Party Beneficiary.
> Wells Fargo Bank, N.A. as master servicer and securities administrator under the Master Servicing and Trust Agreement, dated as of January 1, 2006, among GS Mortgage Securities Corp., Deutsche Bank National Trust Company and Wells Fargo Bank, N.A., shall be considered a third-party beneficiary to this Agreement entitled to all of the rights and benefits accruing to it as if it were a direct party to this Agreement.

Doc. 51-1 at 7–8. Section 16 does not preclude a finding that LL Funds is a third-party beneficiary of the Servicing Agreement as incorporated by the Step 2 Assignment. Section 16 does not contain any restrictive language, such as saying that Wells Fargo is the "only" or "sole" third-party beneficiary under the Servicing Agreement, but rather simply states that Wells Fargo is "a" third-party beneficiary under the Servicing Agreement. Section 16 could reasonably be interpreted as designating Wells Fargo as one third-party beneficiary while leaving who else may be a third-party beneficiary uncertain. See Trepel v. City of N.Y., No. 98-CV-6327 (JG), 2000 WL 1364362, at *6 (E.D.N.Y. Sept. 11, 2000) (rejecting argument that provision identifying party as "an" third-party beneficiary established that parties to contract did not intend for anyone else to be a third party beneficiary to the contract).

There is an additional reason to find it plausible that LL Funds is a third-party beneficiary: Parties like LL Funds would have relied on Saxon's promise to service the loans in the Trust when deciding whether to buy certificates. "Among the circumstances to be considered [in the third-party beneficiary analysis] is whether manifestation of the intention of the promisor and promisee is sufficient, in a contractual setting, to make reliance by the beneficiary both

11

reasonable and probable." <u>Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.</u>, 485 N.E.2d 208, 212 (N.Y. 1985) (quotation and internal quotation marks omitted).   Because Saxon's servicing obligations were critical to Certificateholders getting a return on their investments, it is both reasonable and probable that Certificateholders would rely on the MSTA and Step 2 Assignment as manifesting an intent to confer the benefit of Saxon's servicing obligations on them.

### B. Extent of Possible Damages

Defendants contend that allowing LL Funds to seek damages for the entire Trust is inconsistent with the purpose of a direct action.   <u>See Yudell v. Gilbert</u>, 949 N.Y.S.2d 380, 383 (N.Y. App. Div. 2012) ("A plaintiff asserting a direct claim seeks redress for injury to him or herself individually."); <u>Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.</u>, 829 A.2d 143, 150 (Del. Ch. 2003) ("[I]n a direct action the plaintiff sues to redress an injury suffered by the individual plaintiff and damages recovered are paid directly to the plaintiff who was injured."). They argue that allowing LL Funds to seek Trust-wide damages without requiring it to comply with Rules 23 or 23.1 could potentially subject Defendants to multiple lawsuits seeking overlapping relief.

LL Funds has been inconsistent about the type of damages being sought in this case.   LL Funds in its response to Defendants' motions to dismiss stated that it only "seeks to recover its own unique losses within the Trust's waterfall." Doc. 33 at 16.   Wells Fargo relied on this representation and withdrew its argument that LL Funds' claims were derivative. Doc. 37 at 1 (citing Doc. 33 at 16–20).   However, LL Funds' most recent filing, as well as its amended complaint, state that LL Funds is seeking damages on behalf of all Certificateholders.  Doc. 45 at ¶ 3; Doc. 52 at 5–7.

LL Funds has been similarly inconsistent about who the plaintiff in this case is. For example, many of the paragraphs in the amended complaint and the caption itself state that the Trust is the plaintiff. Doc. 45 at ¶ 1 ("Plaintiff is a residential mortgage-backed securities ("RMBS") trust for which Defendant Wells Fargo serves as the Master Servicer, and Defendant Saxon served as the Servicer."); Doc. 45 at ¶ 2 ("The Plaintiff GSAA Home Equity Trust 2006-2 was established pursuant to the Master Servicing and Trust Agreement . . . ."); Doc. 45 at ¶ 3 ("[P]ursuant to its contractual rights under the PSA, LL Funds bring this action in the name of the Trust for the 'common benefit of all Certificateholders' affected by the actions of the Defendants.").

Other paragraphs, however, identify LL Funds as the plaintiff. Doc. 45 at ¶ 60 ("The Plaintiff's (and its Certificateholders') damages are direct, and not derivative. Plaintiff nonetheless shall take all steps necessary to make certain that the rights of all affected Certificateholders are protected to the extent Plaintiff is required to do so by operation of law or the MSTA at issue."); Doc. 45 at ¶ 61 ("Upon any recovery paid to the Trust, LL Funds is entitled to payment of such proceeds pursuant to the MSTA."); Doc. 45 at ¶ 62 ("Demand has been made on the Trustee who has ceded its rights and duties as Trustee, with respect to the claims made herein, to LL Funds."); Doc. 45 at ¶ 65 ("Under the MSTA, Defendant Wells Fargo was obligated to ensure that Defendant Saxon 'duly and punctually perform[ed]' its servicing duties and obligations and to prevent Saxon from engaging in improper and/or arguably illegal acts with respect to any loans that the Trust held for the benefit of Plaintiff."); Doc. 45 at ¶ 75 ("As servicer under the MSTA and Servicing Agreement, Saxon was responsible for servicing the loans, which were deposited into the Trust 'for the benefit of the Certificateholders,' such as Plaintiff.").

13

LL Funds' most recent filing insists that the "Plaintiff in this matter is the Trust." Doc. 52 at 5. The problem with designating the Trust as the plaintiff is that an express trust like the one here, see Doc. 27-1 at 53, is not a juridical entity that can sue or be sued, see Springer v. U.S. Bank Nat'l Ass'n, No. 15-cv-1107(JGK), 2015 WL 9462083, at *2 n.1 (S.D.N.Y. Dec. 23, 2015) (explaining that under "New York law, a [RMBS] trust cannot sue or be sued, and suits must be brought by or against the trustee"); Schmeglar v. PHM Fin. (In re Schmeglar), 531 B.R. 735, 740 (Bankr. N.D. Ill. 2015) ("Under New York state law, investment trusts, such as the one created by the PSA, may hold property in their own name, but that other powers, such as the power to sue, are vested in the trustee."); Anh Nguyet Tran v. Bank of N.Y., No. 13 Civ. 580(RPP), 2014 WL 1225575, at *1 n.4 (S.D.N.Y. Mar. 24, 2014) (stating that the trust in that case, which was an RMBS trust, was "not a person that can sue or be sued, and litigation involving [the] trust must be brought by or against the trustee in its capacity as such"). Because the Trust cannot sue or be sued, LL Funds cannot recover damages for the Trust by bringing suit in the Trust's name, and cannot thereby create a "waterfall" through the Trust to it and other Certificateholders. See Doc. 33 at 16 (LL Funds seeking to recover its damages "within the Trust's waterfall" of damages).

LL Funds argues in its most recent filing that the no-action clause gives it a contractual right to stand in the Trustee's shoes, enforce the Trustee's rights, and recover damages on behalf of all Certificateholders. A trustee could seek trust damages on behalf of all of a trust's beneficiaries. See Velez v. Feinstein, 451 N.Y.S.2d 110, 114 (N.Y. App. Div. 1982) ("Where a claim exists in favor of the trust (properly speaking, of the trustees in their trust capacity) against third persons and the trustees are under a duty to enforce that claim and have improperly and unjustifiably failed to do so, the beneficiaries may bring a suit on behalf of the trust, analogous to

14

stockholders' derivative suits on behalf of a corporation."); 76 Am. Jur. 2d Trusts § 612 (updated August 2016). So a beneficiary standing in the trustee's shoes could presumably do so as well. But that is not what is happening here. LL Funds does not bring this case in the name of Trustee Deutsche. Also, when a beneficiary sues to enforce a claim belonging to the trustee that the trustee could have enforced itself, the beneficiary's suit is derivative, not direct. CFIP Master Fund, LTD v. CitiBank, N.A., 738 F. Supp. 2d 450, 477–78 (S.D.N.Y. 2010) (concluding that suit brought by beneficiary on trustee's behalf was a derivative suit); Velez, 451 N.Y.S.2d at 115 (explaining that claims brought by trust beneficiaries against third persons on behalf of the trust were "clearly derivative claims"). Here, LL Funds insists that its claims are direct and again has not pleaded that it is suing on Deutsche's behalf or in Deutsche's name or as a derivative suit.

LL Funds' other argument for being able to recover Trust-wide damages is that the provision of the no-action clause stating that a Certificateholder cannot enforce any right under the MSTA "except . . . for the common benefit of all Certificateholders" means that a Certificateholder suit must seek damages on behalf of all of the Certificateholders. Saxon made a similar argument earlier in this litigation when arguing that LL Funds' claims were derivative. See Doc. 35 at 3 ("And the operative Trust documents expressly provide that a certificateholder cannot sue the mortgage loan servicer *unless* it is for the common benefit of all certificateholders."); Doc. 42 at 67 ("In fact, there's a requirement in the Servicing Agreement that any claim that they bring be for the benefit of all the Certificateholders in the Trust."). LL Funds' allegations for damages for all Certificateholders seems designed at least in part to comply with the language of the no-action clause.

LL Funds nevertheless has not taken any steps, such as styling this case as a class action or joining other Certificateholders under Federal Rule of Civil Procedure 19, to establish that LL

Funds is suing in a representative capacity on behalf of all Certificateholders. Nor has LL Funds cited a single case holding that a certificateholder in a securities trust on its own can sue the trust's servicers directly for trust-wide damages without bringing a class action or joining the absent certificateholders.[3] This Court—a district court from the District of South Dakota—is reluctant to be the first to extend New York law to allow LL Funds to do what apparently no other court has allowed a certificateholder in a securities trust to do. However, this Court is equally reluctant to dismiss claims at this time when doing so might spur Defendants to assert that the absence of such claims for the benefit of all Certificateholders debars the case under the no-action clause. Besides, a New York court handling a different case may well resolve this issue during the pendency of this case.

In the context of a motion to dismiss, this Court need not determine whether LL Funds—without joining other Certificateholders, bringing a class action, or at least a declaratory judgment claim for the benefit of all Certificateholders—can somehow recover damages or obtain relief on behalf of all Certificateholders. Regardless of whether LL Funds can recover Trust-wide damages, this Court would allow LL Funds to discover information about Saxon's servicing of all the loans in the Trust. This Court likely will revisit this issue perhaps in ruling on summary judgment motions.

## III. Conclusion

For the reasons stated above, it is hereby

---

[3] LL Funds in its supplemental briefing cites three cases involving RMBS trusts and applying New York law: Royal Park Investments SA/NV v. Deutsche Bank National Trust Co., 14-CV-4394 (AJN), 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016); Royal Park Investments SA/NV v. HSBC Bank USA, National Ass'n, 109 F. Supp. 3d 587 (S.D.N.Y. 2015); and Blackrock Allocation Target Shares: Series S Portfolio v. U.S. Bank National Ass'n, No. 14-cv-9401(KBF), 2015 WL 2359319 (S.D.N.Y. May 18, 2015). All three of these cases were class actions against the Trustees of RMBS trusts. Deutsche Bank, CIV No. 14-4394, Doc. 1; HSBC Bank, 109 F. Supp. 3d at 594 n.4; Blackrock, 2015 WL 2359319, at *1.

ORDERED that the remaining portions of Defendants' motions to dismiss, Docs. 25, 28, are denied.

DATED this 8th day of August, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

17